Booth, Chief Justice,
delivered the opinion of the court:
This case is now before the court upon plaintiffs’ and defendant’s second motions for a new trial. The present conclusions of the court, in view of certain conceded corrections of the findings, make it imperative to reconsider the case in most of its aspects, and state our judgment in this our final opinion.
The case, like all tribal Indian cases, is before us under a special jurisdictional act, approved March 13, 1924 (43' Stat. 21). The act is set forth in finding I and no controversy revolves around it. The case was argued and submitted upon issues of fact and law.
Four claims are asserted in the petition:
1. Claim on behalf of all the plaintiffs for loss and damage resulting to them because of the alleged failure of the defendant to protect from invasion, and consequently protect from destruction the buffalo and other game upon the territory comprising 19,044 square miles, defined in article 3 of the treaty of October 17, 1855 (11 Stat. 657). The sums sought to be recovered under this claim are: For the Blackfeet, Blood, and Piegan Tribes, $19,200,000; for the Gros Ventre Tribe, $5,760,000; and for the Nez Perce, $19,200,000; a total of $44,160,000.
2. Claim of plaintiffs, the Blackfeet, Blood, Piegan, and Gros Ventre Tribes, for the surface and royalty values of the 13,361,200 acres of land granted to them by article 4 of the treaty of 1855, which it is alleged were taken by the *117 United States without the consent or agreement of the tribes, and for which they have not been compensated, amounting to $24,312,753.09.
3. Claim of plaintiffs, the Blackfeet, Blood, Piegan, and Gros Ventre Tribes, for the value of 2,092,420 acres of land alleged to have been taken by the defendant in virtue of the Executive order of August 19, 1874, and for which plaintiffs have not been compensated, amounting to $2,615,525.00.
4. Claim of plaintiffs, the Blackfeet Tribes, based on the acts of the defendant, under the act of Congress of May 11, 1910 (36 Stat. 354), in taking from them and depriving them of the right to cut and remove wood for agency and school purposes, and for their personal use for houses, fences, and all other domestic purposes, and to hunt and fish thereon, a tract of land constituting a part of Glacier National Park, which rights had been reserved by the plaintiffs in an agreement with the defendant ratified by the act of June 10, 1896 (29 Stat. 321), $250,000.
The total recovery sought in the petition on the four claims aggregates $71,338,278.09. This demand is considerably increased in plaintiffs’ requested findings of fact.
The Blackfoot Nation of Indians constituted a confederated tribe made up of Blackfeet, Blood, Piegan, and Gros Ventre Indians. Prior to 1855 they were “ a wild, warlike, nomadic people, depending upon the buffalo for practically every want of their primitive existence ”, and this particular soiirce of living was at the time not only sufficient but more than abundant. In the territory over which they roamed and hunted, i. e., the plains of the Muscle Shell, the Judith, the Missouri, the Milk and the Saskatchewan Rivers in the Rocky Mountain country, not only were buffalo in large numbers to be found, but additional small game, as well as deer, antelope, mountain sheep, and a variety of fur-bearing animals abounded in vast numbers — an area amply suited to their habits and purposes.
The early habitat of the Nez Perce Tribe was in what is now western Idaho, northeastern Oregon, and southeastern Washington. Unlike the Blackfeet, who relied principally upon the buffalo for living, this tribe subsisted upon salmon, *118 roots, and berries, which were obtainable in abundance from and adjacent to the headwaters of the Columbia and Snake Rivers. Following the introduction of horses into their country they embraced more nomadic habits and thereafter pursued in semiannual expeditions the same class of food found in the plains east of the Rocky Mountains.
The plaintiff Indians were not the only tribes who resided near and hunted upon the territory above described. Neighboring tribes mentioned in the treaty of 1855 and the Laramie Treaty of 1851 traversed this precise area in pursuit of the buffalo and other game, resulting in frequent hostilities between the tribes and creating a precarious condition for white emigrants going upon or passing through the territory, an existing condition inimical to the policy of the Government in its relationship to the Indians and the civilization of the tribes themselves.
The written instructions given by the Commissioner of Indian Affairs to the representatives of the Government selected to negotiate with the Indians explicitly set forth the purpose and intent of the treaty of 1855. In keeping with the Government’s established policy, the treaty was intended to establish amicable relations between the Government and the Indians, foreclose internecine warfare, establish a condition favorable to working a change in their present habits and mode of living, encourage cultivation of the soil, and render the country involved safe for both the Indian tribes and white emigrants.
The Government recognized the increasing emigration to the West; the condition which prevailed in this territory within a few years subsequent to 1855 was clearly and correctly anticipated by the Government officials, and the treaty of 1855, supplemented by contemporaneous reports of accredited officials of the Government, discloses with far greater certainty the exact status of affairs than the oral testimony of witnesses taken generations after the event and elicited from witnesses who recite what occurred in their very early childhood. Undoubtedly they narrate what they remember, but written records of events and conditions preserved in histories and official documents prepared in large part by wholly disinterested parties, universally accepted as accurate, *119 are obviously more convincing than oral testimony produced long after the event.
Article 3 of the treaty of October 17, 1855, we quote in kaee verba, as follows (11 Stat. 657):
“ART. 3. The Blackfoot Nation consent and agree that all that portion of the country recognized and defined by the treaty of Laramie as Blackfoot territory, lying within lines drawn from the Hell Gate or Medicine Bock Passes in the main range of the Bocky Mountains, in an easterly direction to the nearest source of the Muscle Shell Biver, thence up to the mouth of Twenty-five Yard Creek, thence up the Yellowstone Biver to its northern source, and thence along the main range of the Bocky Mountains, in a northerly direction, to the point of beginning, shall be a common hunting ground for ninety-nine years, where all the nations, tribes, and bands of Indians, parties to this treaty, may enjoy equal and uninterrupted privileges of hunting, fishing, and gathering fruit, grazing animals, curing meat, and dressing robes. They further agree that they will not establish villages, or in any other way exercise exclusive rights within ten miles of the northern line of the common hunting ground, and that the parties to this treaty may hunt on said northern boundary line and within ten miles thereof:
“ Provided, That the western Indians, parties to this treaty, may hunt on the trail leading down the Muscle Shell to the Yellowstone; the Muscle Shell Biver being the boundary separating the Blackfoot from the Crow territory:
“ And provided, That no nation, band, or tribe of Indians, parties to this treaty, nor any other Indians, shall be permitted to establish permanent settlements, or in any other way exercise, during the period above mentioned, exclusive rights or privileges within the limits of the above-described hunting ground:
“And provided fwfher, That the rights of the western Indians to a whole or a part of the common hunting ground derived from occupancy and possession shall not be affected by this article, except so far as said rights may be determined by the treaty of Laramie.”
The first item in suit is predicated upon an alleged liability to plaintiffs growing out of the foregoing article in conjunction with article 7 of the same treaty as follows:
“Art. 7. The aforesaid nations and tribes of Indians agree that citizens of the United States may live in and pass unmolested through the countries respectively occupied and claimed by them. And the United States is hereby bound *120 to protect said Indians against depredations and other unlawful acts which white men residing in or passing through cheir country may commit.”
Prior to 1855 the plaintiffs and neighboring tribes of Indians frequently clashed, provoked to hostilities over conflicting claims to hunting grounds. The buffalo, as previously observed, was the principal source of living for the Blackfoot Nation, and sought after by the other tribes. The area described in article 8 as a “ common hunting ground ” was claimed by plaintiffs, but it had not been ceded to them in any treaty. It was at the time rich in game of almost every description.
The plaintiffs contend that the establishment of the common hunting ground for a period of ninety-nine years by article 3 of the treaty vested in them a proprietary interest in the food and shelter supply which the area afforded, and which the Government by article 7 of the treaty obligated itself to protect and secure to them for the full term of ninety-nine years; that the Government failed to observe this obligation; that on the contrary, as early as 1858, three years after the execution of the treaty, it permitted white emigrants and others to invade said area, who killed and destroyed the game and otherwise rendered the same valueless to the plaintiffs as a source of living.
The damages claimed under this item total $44,160,000 and the total amount claimed is prorated among the tribes claiming, in the following amounts, viz, Blackfeet, Blood, and Piegan Tribes, $200,000 per annum, for an unexpired term of 96 years, a total sum of $19,200,000; the Gros Ventres $60,000 per annum, a total of $5,160,000 for 96 years, and the Nez Perce Tribe $200,000 per annum, a total of $19,200,000 for the same period of time. The amounts given are taken from the plaintiffs’ petition. The plaintiffs in the request for findings claim $57,212,000.
The proof adduced to sustain the damages claimed is based upon what the plaintiffs assert as the reasonable value of the hunting grounds to the plaintiffs, equal in amount to the value of the food, clothing, lodges for shelter, bedding, furs, and hides necessary for the support and maintenance of each of the tribes for that portion of the 99 years of which *121 they allege they were deprived. From historical and official documents the average number of the various tribes interested is sought to be established and a stated sum of $100 per year per person is fixed as the reasonable value of food, etc., necessary to maintain them.
The treaty contains no express stipulation that the Government will respond in damages for the diminution in quantity or the entire loss of food and shelter supplies at the time available on the hunting ground. Article 1, relied upon, has exclusive reference to the plaintiffs’ Indian reservation set aside and ceded to them in article 4 of the treaty, and as to the Nez Perce Tribe, by article 2 of a treaty consummated June 11, 1855, between this tribe and the Government. The hunting ground was not Indian territory in a legal sense; no one tribe possessed any exclusive right of occupancy. The limited privilege and license to exploit the territory for game and wild animals, while limited as to parties, was not, we think, intended to fix other obligations than the one to delimit an area of lands, vast in extent, over which the Indians mentioned might hunt without interference from other and hostile tribes. Assuredly no article of the treaty may be cited wherein the Government obligated itself to maintain this enormous acreage of land as a game preserve for the Indians for 99 years. The right accorded was a permissive one and its continued existence was dependent upon numerous factors over which neither the Government nor the Indians could possibly have control. The Indians for many years had hunted over this area and conflicting claims were set up as to the right to do so; the treaty did no more than adjust the difference by an amicable agreement among the Indians that those mentioned in the treaty would assent to the common privilege set forth therein, without in any way or by any terms guaranteeing to the Indians a maintenance of the status quo for almost a century.
We need not, however, discuss at length the arguments pro and con advanced in the briefs. The plaintiffs’ contention is vulnerable in many aspects. The court under the law could not award a money judgment upon proof conjectural and uncertain as to facts. Human testimony is incapable of establishing with any degree of certainty that *122 either the quantity or character of food and shelter supplies at the time on the hunting ground area would have remained sufficient to supply the plaintiffs’ needs had not the white emigrants and the Indian traders gone upon the lands. Well-defined customs and rules did in some instances govern the buffalo hunt. It is probable that in early times the Indians in their own way regulated to some extent the number of buffaloes each tribe would take; but in later years as the Indian trader and the emigrant pushed their way into this region, limitation of numbers to be taken disappeared and both Indians and white settlers disregarded the essential necessity of preserving the buffalo and took them in numbers beyond their living necessities. It would be impossible from the record to ascribe to the Government alone the responsibility for the disappearance of game and wild animals from the hunting ground. The Indians participated in this devastation and were eager and willing to enter into the prevalent custom of bartering buffalo hides and other valuable pelts for what the trader had to give in exchange. There were comparatively few white settlers within the hunting area up to 1862. The discovery of gold vastly stimulated emigration into this region, and plaintiffs’ petition alleges that by 1858 buffalo had almost disappeared.
The real or even reasonable value to the plaintiffs of the hunting grounds, in the way of game and wild animals, has not been proven, and the proof presented to sustain it is manifestly of such a character as to preclude the court from awarding a money judgment against the Government of millions of dollars.
Again, it is extremely doubtful if the buffalo and other wild animals within the area were, at the time the treaty was made, sufficient in number to supply what we may say is the inflexible sum set up as necessary to support an individual Indian. The record ampty supports the Government’s contention that the Buffalo was not the predominating game of the hunting ground after 1855. On the contrary, the area was rather confined to small game, deer, antelope, and a variety of fur-bearing animals. It would be difficult, in view of the proof submitted, to hold that the *123 buffalo existed in sufficient numbers within the area tO' meet all the living wants of the plaintiff Indians at all times.
The rule as to construction of treaties with the Indians invoked by plaintiffs does not extend to the point whereby the court may indulge presumptions and implications of assumed obligations if the attendant facts and circumstances surrounding the created relationship clearly negative any intention upon the part of the Government to respond in damages in the event the contemplated results do not obtain.
Manifestly it would exact a most convincing degree of proof to warrant the court in holding that, by either the express terms of the treaty of 1855 or by necessary implication from them, the Government intended to guarantee to the Indian population involved a source from which they might derive their living for 99 years.
While it is true that in 1855 the hunting ground area was a more or less wild and uninhabited tract of land located in a section of the country where Indian tribes in large numbers had their habitat, nevertheless it is apparent from the many obligations the Government expressly assumed in the treaty and afterwards observed that had it been the intention of the Government to pay for the extermination of game within the area, or otherwise respond in damages if the privilege of hunting therein was lost to the Indians, the treaty would have so provided. Leighton v. United States, 161 U. S. 291.
Article 4 of the Blackfoot Treaty of October 17, 1855, delimited a reservation to the tribe out of the lands embraced within the designated hunting ground. On March 3, 1865 (13 Stat. 541, 559), Congress appropriated $15,000 to be used by the Secretary of the Interior in an effort to negotiate a treaty with the Blackfoot Nation to secure if possible a cession of so much of their existing reservation “ as lies south of the Missouri River.” The moving cause for this legislation and procedure was a prevalent supposition that the lands abounded in gold and should be made available to settlement by incoming emigrants. A treaty was made with the plaintiffs at Fort Benton, Montana, on November 16,1865 (4 Kapp. 1133), by the terms of which the United States procured the contemplated cession,- but the treaty, it is admitted, failed, for immediately after its consummation the Indians became *124 hostile and the Secretary of the Interior did not submit it for ratification.
November 15, 1867, the Secretary of the Interior renewed the efforts to procure a treaty similar to the one of 1865, and as a result a treaty was concluded with the Gros Ventre Tribe of the nation on July 13, 1868 (3 Kapp. 705), and later with the Blackfoot Nation on September 1, 1868 (4 Kapp. 1138). Two treaties instead of one were due to the fact that the Gros Ventres had during the interim separated from the nation proper and were living at a distance therefrom. These treaties were substantially alike, and the pertinent provisions herein involved go to the reservations established and the lands ceded. Beyond a doubt, as the articles of the treaties state, the Indians were willing to cede to the United States all the lands set aside to them by articles 3 and 4 of the treaty of 1855, accepting the delimited reservation'provided in the treaty for them in consideration of the payments of money to be made and other beneficial provisions contained in the same. The treaty contained the following provision:
“ This treaty shall be obligatory upon the contracting parties whenever the same shall be ratified by the President and Senate of the United States, and shall continue in force for twenty years from and after said date unless sooner violated and broken by said Indians.”
These treaties were never ratified by the President and Senate of the United States. The reason why is not material ; if it is, it may possibly be ascribed to objection to some or many of the treaties’ provisions or to the contemplated change of governmental policy with respect to dealing with the Indians. Plaintiffs and defendant suggest the latter reason, for some three years later, in 1871, Congress enacted legislation (16 Stat. 544) discontinuing the policy of negotiating treaties with Indian tribes and dealing directly therewith by acts of Congress.
If either the treaty of 1865 or 1868 was a valid and binding agreement between the Indians and the United States, obviously the claim of the Indians asserted herein is in all substantial respects without merit. If, on the contrary, they failed as treaty agreements because of lack of ratification, the plaintiffs’ reservation was not ceded as therein *125 stated. The defendant contended in its original brief, and repeats the same in its brief upon motion for a new trial, that the treaties were binding and valid agreements.
If we correctly apprehend the defense — a new and novel one — it is predicated upon the doctrine of estoppel, i. e., the Indians having entered into the treaty agreements and the United States having substantially observed its obligations thereunder, the court must infer that both parties treated and recognized the treaty as valid and binding, notwithstanding it was submitted to the Senate for ratification and was not ratified. In. other words, the court is to assume that the legislation with respect to plaintiff’s lands and the appropriations made for their benefit subsequent to 1868 by Congress is in legal effect a ratification of the treaty, and was so understood and recognized by the parties.
The first and primary question to be considered is the legal and political status of the parties at the time the treaty was made and subsequent thereto. It is a familiar and very ancient rule of Indian law that tribal Indians, from, and even prior to, the adoption of the Constitution, were regarded as domestic dependent nations. They were accorded a pos-sessory titie to their claimed lands dependent upon occupancy. For more than eighty years the United States entered into treaties with the Indians, in each of which their landed estates were concerned; the negotiation of treaties was entrusted to Commissioners duly appointed for such purpose, and their validity depended upon ratification. The same procedure was uniformly adopted which applied to treaties with a foreign power. Cherokee Nation v. Georgia, 5 Pet. 1.
The courts of the United States, without a single exception, have approached the adjudication of Indian rights arising under Indian treaties with the fundamental principle of law in view, that the Indian tribe, unlettered and subordinated to a superior power, was entitled to have all doubts resolved in its favor, and that the parties to the treaty were not in all respects upon an equal footing. What the representatives of the Indian tribe understood with regard to their rights was a vital factor in determining the scope and effect of treaties. The Indians looked, as long ago said, “ to our Government for protection ”; they had faith in the *126 observation of treaties, and above all else they wanted the approval of the President “ whom they addressed as their father ”, and the Congress to what was done. No court has ever held that the Indian tribes, parties to treaties with the United States, were in all respects sui jwris, or to be treated as such. Therefore, it is our opinion that what the Indians did subsequent to the abortive treaty of 1868 was only what they had to do, or go on the warpath. The contributions they received were, of course accepted as either coming from the Government in pursuance of its Indian policy or in an indifferent attitude towards their source. The tribal Indians at this time looked to the Government for support, for the wild lands which theretofore supplied their living were rapidly yielding to the western emigrant, and this the Government recognized, not only in observance of treaty stipulations but by generous appropriations of money in addition. There is no fact of record which indicates that the Indians thought they were receiving these funds in fulfillment of the treaty obligations of 1868. United States v. Kagama, 118 U. S. 375; Jones v. Meehan, 175 U. S. 1. The competency of the parties to fully comprehend their rights is an important factor in characterizing conduct.
We can find no precedent which would warrant a departure from the reason for the necessity of formal ratification of Indian treaties. Indian treaties were negotiated by duly accredited commissioners of the United States, and Congress in no legislation pointed out to the court ever indicated an intent to entrust the finality of the agreements and surrender the superior right of supervision, amendment, and approval, by way of ratification of the same, until 1871. Until 1871 the Congress refused u to expose the Government to the errors of a single person ” and ratification of a treaty to render it obligatory was uniformly recognized. The act of March 3, 1871 (16 Stat. 544, 566), changing the Indian policy of the Government, contains provisions which disclose the Government’s clear intentions to withhold the exercise of a power possessed over Indian tribal lands and property as to past transactions evidenced by treaties, and *127 preserve rights acquired thereunder. We quote the act as follows:
u For insurance and transportation of goods for the Yank-tons, one thousand five hundred dollars: Provided, That hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty: Provided fwrbher. That nothing herein contained shall be construed to invalidate or impair the obligation of any treaty heretofore lawfully made and ratified with any such Indian nation or tribe.” (Last italics inserted.)
We have yet to find a single instance in the whole course of the relationship between tribal Indians and the Government where the latter has surrendered, either in dealings between itself and the tribes or in dealings of third parties with the tribes, its sovereign right of supervision, control, and approval. All the Indian legislation with which this court is familiar has either directly and expressly determined Indian and governmental rights involved therein or taken the form of agreements between the parties which became effective after submission for approval of the tribe and later ratified by Congress. The doctrine of governmental ratification has been firmly entrenched during the entire course of the Indian relationship. The tribal Indian was in law the ward of the Nation, and, notwithstanding comparatively recent acts, the relationship to a considerable extent continues to exist. No third party may make a contract with tribal Indians to act for them in the capacity of an attorney at law or in fact without first complying strictly with section 2103, Revised Statutes, and procuring the approval of the Secretary of the Interior to the contract, Congress having delegated to the Secretary this authority. In the face of this long-continued and existing policy it is impossible for the court to hold that contractual rights involving the Indians’ estate in lands accrue because perchance the Government’s dealings with the Indians during a period of .nineteen years bear some similarity to the stipulations of an unratified treaty. The Government’s policy was expressed in the treaty in many if not all of its aspects. The articles reflect what the Government considered its duty aside from the treaty, and manifestly appro *128 priation bills would follow the segregation of obligations assumed. No one would suppose the Government intended Indian appropriations to be in a lump sum, and to be disbursed by the tribal Indians in their discretion. The uniformity of appropriation statutes with respect to all the Indian tribes, irrespective of treaties, attests this fact.
We think the defense is vulnerable in another important respect. If the treaty of 1868 delimited the plaintiffs’ reservation and accomplished the cession of their surplus lands, the legislation which thereafter attempted to establish a similar reservation was unnecessary. It was not until July 5, 1873 (1 Kapp. 855), that the Government by direct act set aside a reservation for the plaintiffs and other Indians, and this reservation so set aside by Executive order added to the reservation delimited in 1868, 4,332,440 acres. In 1874 by legislation a different reservation was delimited for the plaintiffs and the total area decreased to the extent of 2,115,993.6 acres. Again, in 1875, the reservation was increased which resulted in the end in a' total increase of the reservation to the extent of 5,575,680 acres. This legislation, enacted at a time when the policy of the Government was to deal directly with tribal Indian lands, can hardly be said to have been enacted upon the basis of a congressional belief that an unratified treaty concluded in 1868 conferred a right to place foreign Indians upon plaintiffs’ reservation.
On the contrary, the large increase in acreage which finally entered into the question seems to indicate that Congress recognized a very substantial increase was essential to care for the augmented population of the reservation which was in 1888 placed thereon.- The agreement of May 1, 1888 (25 Stat. 113), resulted from the authorized negotiations of 1887 wherein the Secretary of the Interior was to secure, if possible, an agreement from the Indians of northern Montana and Fort Berthold, Dakota, for a reduction of present reservations, or removal to new ones (24 Stat. 29, 44). The Secretary concluded negotiations which are evidenced by the agreement ratified by Congress May 1,1888. The ratified agreement of 1888 disposes of the lands delimited as a reservation for the plaintiffs in 1874, and specifically recites that said reservation being in excess of the needs of the nation, *129 a desire exists to dispose of so much of the reservation as is not required by the Indians in order to acquire sufficient funds to maintain the nation and promote its civilization.
No provision of any act in this series of legislation refers to the unratified treaty of 1868, and the fact that Congress in 1874 permitted the plaintiff Indians to occupy a reservation containing an area of S3,830 square miles, or 21,651,200 acres, indicates that the moving cause for the ratified agreement of 1888 was a disintegration of this enormous reservation area and its segregation into distinct reservations for the Indian tribes of northern Montana, and this is precisely what was done; the Sioux, Assineboine, Gros Yentre, and Blackfoot Nations composed of Piegan, Blood, and Blackfeet Indians received a delimited reservation, and the United States received a cession of 17,500,000 acres of land thrown open to public settlement.
Notwithstanding the inherent difficulties of indulging inferences that Indian legislation resulted from the preconceived validity by the Congress of an unratified treat}'' which had been before the Senate for consideration from 1868 to 1871 and never ratified, we think the legislation referred to indicates an exercise of the exclusive jurisdiction Congress possessed over tribal Indian lands and funds as to an existing condition of affairs relating not only to the plaintiffs but to all the Indian tribes in northern Montana. It discloses an adherence to the established Indian policy of the Nation, and in the absence of an express and more positive intention than the record discloses, we cannot say the legislation was induced by any other cause or for any other reason.
The defendant concedes that there was a determined opposition upon the part of Congress to paying the debts due from the Indians to Indian traders which the treaty of 1868 provided should be done, but which Congress never paid, and we cannot assume that Congress without legislative action approved a treaty which manifestly involved numerous provisions of both pecuniary and moral concern to the Government, because perchance in subsequent legislation no provision was made for paying the Indians for their surplus lands. Omissions of this character have occurred heretofore, and numerous special jurisdictional acts have been passed to *130 afford the Indians a forum where their rights due to the same might be adjudicated and determined. We find nothing in the record indicative of the fact that the conduct of the Indians subsequent to 1868 lulled the United States into a prejudicial position which it would not have assumed except for the same. The bookkeeping methods of the Treasury Department can hardly be available to charge actual knowledge of the same to a tribe of Indians residing some three thousand miles away, and, as self-serving evidence, are not convincing.
The United States did not, subsequent to the conclusion of the treaties, restore the lands ceded to the public domain until 1874, and only then in pursuance of congressional authority so to do, and while separate Indian agencies were established within this territory to which foreign Indian tribes were attached, this fact is not alone sufficient to warrant an inference that the Indians conceded the right under the unratified treaties. As a matter of fact, the Indians could have accomplished no more than a protest against the acts of the Government, as about that time the Government’s policy of dealing with the Indians was in process of radical change, involving direct legislation in opposition to treaty negotiations theretofore prevailing. Aside from our opinion that unrati-fied treaties, which expressly provide that they are to become effective only when ratified, are not binding, the court would hesitate to apply the doctrine of estoppel to tribal Indians, in the absence of positive proof that the tribe as such comprehended its rights and was accepting benefits from the Government with full knowledge of and in pursuance of rights created by treaties between the parties. We need not cite precedents to establish the rule that Indian treaties prior to 1871 were recognized, though made with dependent nations, as binding contracts creating mutual rights and duties which special jurisdictional acts empowered this court to adjudicate and determine. The special act in this case refers specifically the claim of the plaintiff Indians “ by virtue of the treaty of October 17,1855 ”, and inasmuch as the defendant does not challenge the right to recover under the unrati-fied treaties except under the rule of estoppel, we think the plaintiffs are entitled to recover under this item in suit. In *131 this connection it is proper to observe that the Nez Perce Tribe has never ceded, nor relinquished its rights under the treaty of 1855.
On the basis of the invalidity of the treaties of 1865 and 1868 it is admitted that the surplus lands ceded to the plaintiffs under the treaty of 1855 and thrown open to settlement by the act of April 15, 1874, totaled 15,289,344 acres. The remaining issue with respect to this area revolves around whether the increased acreage added to plaintiffs’ reservation totaling 5,575,680 acres, should be deducted from the total acreage of 15,289,344 as a basis of judgment for plaintiffs’ loss. Plaintiffs’ reservation having been increased in acreage, their loss was proportionately decreased when their surplus lands were taken under the act of 1874, for the increased area was included in plaintiffs’ cession of their .reservation in 1888 for which they secured consideration.
■ The issue would be one of easy solution were it not for the provisions of the act of May 1, 1888 (25 Stat. 113). This act, embodying agreements between the United States and the tribes of Indians heretofore mentioned, accomplished the cession of the plaintiffs’ entire reservation and .its division into separate reservations ceded to the Sioux, Assineboine, Gros Yentre, and Blackfoot Tribes. In other words, the United States acquired by the agreement of 1888 the plaintiffs’ entire reservation, then totaling 21,651,200 acres, made up of 16,075,520 acres of plaintiffs’ original reservation and the 5,575,680 acres added thereto by the United States. 17,500,000 acres of the reservation, were thrown open to settlement, and 4,151,200 acres segregated into reservations of which the plaintiffs acquired a reservation of 3,099,298 acres.
The agreement of 1888 created a landed unit to which the plaintiff Indians contributed their reservation and the United States 5,575,680 acres. The Indians in virtue of this agreement, wherein consent was given to allocate the unit among the plaintiffs and the foreign Indians as the United States might see fit, put all the tribes upon an equal basis. The plaintiffs acquired their proportionate share of the added lands and the foreign Indians their proportionate share in the entire area, which of course included the plain- *132 tiil's’ contribxxtion. The Government was intending an equitable and just division of the estate and to this end it realized the rights of the plaintiffs. The plaintiffs constituted 54.3 percent of the entire Indian population placed upon the lands, and the foreign Indians 45.7 percent. Predicated upon this percentage of reciprocal rights acquired and surrendered, the plaintiffs failed to derive a monetary benefit in the added lands in excess of the proportion of their population to that of the entire landed estate.
In addition to what has been said, it is to be noted that the act of 1888 was consummated by an express agreement acceded to by the plaintiffs, upon a money consideration substantial in proportions which they then needed, and also secured to them a delimited and permanent home. To secure these monetary and landed benefits the plaintiffs were willing to make a contribution as evidenced by the agreement, and in so doing we believe they should be charged in accord with their proportionate population in the benefits which accrued to all under the act. The agreement could not, or at least it might not, have ever been concluded upon any other basis. The lands added to the reservation by the United States totaled 5,575,680 acres. 54.3% of the same equals 3,027,594.24 acres. To this extent, in equity and fairness, the contribution of the United States entered in the creation of joint estate for the joint benefit of all the Indians. Beyond this the plaintiffs did not, we think, in justice receive a proportionate benefit, and the plaintiffs should not be charged with a greater contribution to the added lands than the above acreage. The defendant in its brief has not favored the court with an expression of settled opinion with respect to the above. A statement is made disclosing the fact and submitting the question “ without further comment ”, which the court, while not accepting as an admission without examination, assumes to be an admission that the contention of the plaintiffs upon the issue is admittedly sound. Finding XIV details the facts.
The most difficult issue is the amount which the plaintiffs are entitled to recover. The reservation set aside for the Indians in 1855, as well as the common hunting grounds *133 described, clearly indicates by its vastness of acreage that the primary objective of the proceedings was peace and amity among the Indians and peaceful relations with the white settlers, rather than any definite consideration of land values. Manifestly neither the representatives of the Government nor the Indians themselves attached great value to the lands involved. The Indians were securing rights in the hunting grounds and a delimited reservation which up to this time had involved force and hostility to protect, and that they attached special value to the lands is not inferable from what was done. The value to the Indians was represented in hunting rights, not in the soil; they possessed neither the inclination nor ability to develop the territory. The Government certainly viewed the situation with manifest indifference to land values. That this is so is demonstrated by the fact that the treaty granted communal hunting rights within a territory over 19,000 square miles in extent.
In 1865 and 1868, and possibly within a few years prior thereto, land values as to the lands involved became of more concern to the white settler and the Government. The supposed existence of gold therein inaugurated a policy of acquiring surplus lands over and above sufficient acreage for Indian reservations and opening the same to public settlement. The Indians, as disclosed by the facts, did not attach greatly enhanced values to the titles by which they held their lands. They were willing in 1868 to cede the over thirteen million acres herein involved to the United States for a total consideration of $1,541,000, to be expended over a period of twenty years, or a trifle less than 12 cents per acre. In 1886 the plaintiffs did part with their land title to 17,500,000 acres for $4,300,000, i. e., 24% cents per acre, so that it is irrefutably established that the Indians both before and after the passage of the act of 1874, did not regard their land titles of extremely great value. Whether this was due to the character of title they possessed, or the location and character of the lands, is not shown. Nowhere does it appear, nor is it charged, that they were overreached or deceived by officials of the United States as to the value of their landed estates when the treaties were signed, and *134 as we view the situation no greater value can be ascribed to the lands than the Indian title thereto was worth in 1874, when they were thrown open to public settlement. United States, v. Winans, 198 U. S. 371; Choctaw Nation v. United States, 119 U. S. 1.
The plaintiffs contend that recovery is to be based upon a value of at least $1.25 per acre, i. e., the value given them by the United States when they were sold under the general land laws subsequent to 1874. In deciding this precise issue the court said in the case of Fort Berthold Indians v. United States, 71 C. Cls. 308, 339:
“ The acreage price offered to settlers was adjusted on a basis of limited allotments, the entire consideration to be paid in stated installments. The judgment we are to render is to be based on takings embracing large areas of land, totaling in two instances millions of acres and in the other close to a hundred thousand acres. When these large tracts were acquired it is apparent that enormous expense is involved in the future segregation of the tracts into marketable units and their sale upon installment payments. The Government’s overhead in the maintenance of a department to accomplish their disposition and the incidental expense accompanying the transaction indisputably establishes that the $1.25 per acre was not all profit, if, in fact, profit accrued at all. The Indians could not have disposed of the lands in the way and manner the Government did, and while the homestead laws valued the lands at $1.25 per acre, the return to the Government was not a net but a gross price. We give the Indians a judgment in this case for the value of the lands free from all the expense of sale or segregation for sale. To claim a uniform price of $1.25 per acre, free from the character of expense enumerated, would, in our judgment, award the plaintiffs a sum much beyond any price they could have obtained had they offered the tracts for sale.
“ The plaintiffs are entitled to just compensation to be fixed upon the basis of the amount they might have obtained for the large areas taken at the time they were taken.”
Taking into consideration the price fixed in contemporaneous treaties made with Indians residing in and adjoining the territory taken, as well as the character of the plaintiffs’ title to the same, we are of the opinion that the fair and reasonable value of the land is not in excess of 50 cents per acre. This conclusion is inescapable when it is further considered that only a few years before the taking of the land by the *135 Government the plaintiffs, in the unratified treaties of 1868, had agreed to cede to the United States 13,173,350.4 acres of land at a price of less than 12 cents per acre, and that plaintiffs later did cede to the United States a larger tract of land than that here involved at a price of 24y2 cents per acre.
Again, the court in fixing acreage value has recourse alone to the record, with its conflicting claims, the plaintiffs contending for public lands and the defendant for prior treaty stipulation values. We have already commented upon the plaintiffs’ argument, and as to the defendant’s, we think a reconciliation of the differences set forth requires a consideration of what the acreage was worth at the time it was taken, in connection with the manner of taking and the title possessed by the Indian nation. It would not, we think, be either just or equitable to ascribe an acreage value to the lands upon the basis of cessions contemplated at a time when pos-sessory rights were regarded as worth little or nothing. In later years the wild lands of the West increased in value, and the Government offered in 1874 to settlers the plaintiffs’ land for $1.25 per acre. So that the court in reaching a conclusion of fact in this respect can do no more than harmonize the record and from all the facts and circumstances reach what it regards as an acreage value sufficient to attain the object of justice and equity.
Another factor of importance enters into- the process of ascertaining and fixing land values under Indian treaties. The Government is not, we think, to be placed in the attitude of simply negotiating a bargain and sale of the lands involved. The condition of the Indians at the time and the maintenance of the Indian policy then in force clearly indicate that the Government, in stipulating for amounts of money to be paid the Indians, was not inspired wholly by the value of the lands acquired, but by an intention to provide as generously as thought proper for the Indian tribes’ necessities in the way of food, clothing, etc., as well as separate funds looking toward the adoption of agricultural pursuits, and in the end accomplishing the civilization of the Indians, if possible, and in so doing may pay more or less than the lands are reasonably worth. Few, if any, Indian treaties disclose a bargain and sale of the Indians’ lands upon the strict corn- *136 mercial basis observed in ordinary transfers of landed property. For this reason the court is firmly convinced that an established value applicable in all cases is not available to the parties as a precedent. Too many factors, varying with respect to the case to be adjudicated, enter into the issue to warrant the court in sustaining a fixed value upon the theory' that the sum claimed is the same sum fixed in some prior litigation.
The plaintiffs — the Blackfeet, Blood, Piegan, and Gros Ventre Tribes — were deprived of 12,261,749.76 acres for which they have not been compensated (finding XIV). These plaintiffs are, therefore, entitled to judgment for the value of the same, which at fifty cents per acre amounts to $6,130,874.88, subject, however, to a reduction of allowable items set up in the defendant’s counterclaim, later to be considered.
SET-OFFS OR COUNTERCLAIMS, INCLUDING GRATUITIES
The act of March 13, 1924, confers jurisdiction upon the court to consider and determine all claims of the plaintiff Indians, and also any legal or equitable defenses, set-offs, or counterclaims, including gratuities, which the United States may have against the said nations or tribes, and to enter judgment thereon.
The report of the Comptroller General discloses that between the date of the treaty, October 17, 1855, and June 30, 1927, the United States expended large sums of money for the use and benefit of all the plaintiff tribes, over and above the disbursements made for their benefit in satisfaction of treaty or other legal obligations. These disbursements amounted to $4,010,301.51 for the Blackfeet, Blood, and Pie-gan Tribes, $1,239,007.34 for the Gros Ventres, and $1,823,-421.86 for the Nez Perce Tribe.
The Nez Perce Tribe not being entitled to recover in any amount, the counterclaim in respect to it need not be considered, as the jurisdictional act does not contemplate the consideration of counterclaims against the plaintiff tribes otherwise than as set-offs against whatever amount they are entitled to recover. Osage Tribe of Indians v. United States, 66 C. Cls. 64.
*137 Plaintiffs do not question that the disbursements contained in the defendant’s counterclaim against the Blackfeet, Blood, Piegan, and Gros Ventre Tribes were made in the amounts stated by the Comptroller General in his report. They contend, however, that certain items included in the expenditures are not properly chargeable against them as set-offs. The items objected to by plaintiffs are as follows:
First: The sum of $58,535.29, an alleged excess of the amount the defendant was obligated to pay plaintiffs under articles 9 and 10 of the treaty of October 17, 1855. Article 9 of the treaty provided for the expenditure of $20,000 annually for a period of 10 years, with the proviso that if, in the judgment of the President and the Senate, this amount be deemed insufficient, it might be increased not to exceed the sum of $35,000 per year. Article 10 provided for the expenditure of $15,000 annually for a period of 10 years. The purposes for which the expenditures were to be made were specifically set forth in each article. It is not shown that the expenditure of $20,000 per year for the period of 10 years, required under article 9 of the treaty, was deemed by the President and the Senate insufficient for the purposes named in the article, nor does it appear that expenditures for the purposes designated were in fact in excess of that amount. The maximum liability, therefore, of the defendant under articles 9 and 10 of the treaty was $350,000. The amount actually expended under the treaty was $408,535.29, an excess of $58,535.29 over the amount the defendant was obligated to expend thereunder. These, excess expenditures were gratuities for which the defendant is entitled to credit.
Second: Expenditures for the payment of agents, Indian police, judges, interpreters, miscellaneous employees, agency buildings and repairs, superintendents and teachers, surveying, and other like items. It is contended by plaintiffs that these disbursements were made for the general administrative expenses of the Indian Service of the United States, and that the record does not show that the plaintiffs, as tribes, received any benefit from such expenditures, or, even if it be assumed they did, to what extent.
It is difficult to conceive any theory under which these expenditures did not inure directly to the benefit of the *138 plaintiff tribes. They were expenditures which the United States was under no legal obligation to make for, or in behalf of, the plaintiffs. They were unqualified gratuities, and, as such, under the plain provisions of the jurisdictional act, are properly chargeable against the plaintiffs as set-offs against the amounts they are entitled to recover.
Third: Disbursements made for the purpose of education. These disbursements amounted, in the case of the Blackfeet, Blood, and Piegan Tribes, to $940,252.23, and for the Gros Yentre Tribe, $359,213.27. The plaintiffs in the motion for a new trial contend that a total deduction of $70,469.01 should be made from the above sums because the deduction claimed is said to have accrued by reason of the expense incurred in sending children to nonagency schools. What this court said in the Fort Berthold- Indian case, 71 C. Cls. 308, is relied upon as authority therefor. In deciding a similar issue in the Fort Berthold case the court, on pages 340 and 341, said:
“ The jurisdictional act charges the Indians with ' all sums heretofore paid or expended for the benefit of said tribe or any band thereof.’ The Government, under the foregoing provision of the jurisdictional act, charges the Indians with $290,827.25, alleged to be pro rata cost of educating individual children of the bands at various nonagency Indian schools. The amount charged is arrived at by ascertaining the per capita cost of maintaining the schools and charging the same to the Indian tribe as the number of children attending appears. The Government during the period maintained at its expense Indian schools at Carlisle, Pa.; Chilocco, Okla.; Lawrence, Kans.; Pipestone, Minn.; and Pierre, S. Dak. Congress appropriated from the Treasury in accord with a governmental policy to extend the privileges of education to Indian children for the express intent of eventually changing the hereditary habits and customs of the tribes. The motive involved was more directly beneficial, from a governmental standpoint, to the Government than to the tribe. Of course, educational facilities were of prime necessity and imperative, and eventually resulted in benefit to the tribe, but the immediate beneficial results were individual and not tribal.
“ We do not believe that the jurisdictional act comprehends a set-off against the claim of the Indians for this item of expenditure in behalf of children of Indian tribes indiscriminately. To so hold might result in sustaining an obvious injustice, for the bands involved in this litigation would *139 be held to contributing a sum toward the maintenance of the schools, while other tribes with much larger attendance would escape payment for benefits of equal value. The sums chargeable, we think, must be restricted to the usually recognized and customary distributions made to the Indians as tribes and bands, unless a contrary purpose is expressed in the act. Public institutions established for the Indian race were maintained from public funds as an adopted public policy, in the nature of gratuity.”
The court was convinced that the language of the special jurisdictional act in the above case did not embrace a set-off of gratuities, and stated that governmental Indian schools were maintained from public funds “ in the nature of gratuity.” In this case the special act authorizes “ set-offs, or counterclaims, including gratuities.” No such language appears in the Fort Berthold Act, and we are of the opinion that in this case it was the intent and purpose of Congress to charge the plaintiffs with all sums disbursed for their benefit oyer and above those provided for in treaty or other obligations. In addition to this, a supplemental report from the General Accounting Office discloses that while some of the items claimed were expended for attendance upon non-agency schools, the greater number were expended for sending children to mission, boarding, and contract schools not maintained by Government appropriations.
This case has been delayed because of two motions, by both parties, to amend the findings and grant a new trial. The plaintiffs vigorously challenge the basis upon which the court awarded a judgment in their favor, and seek to demonstrate that the set-offs allowed by the court, in the matter of the Government’s contribution of lands disposed of under the act of 1888, are erroneous, as well as a charge against the Indians for the expense of educating Indian children at nonagency schools.
The respective motions of the parties exacted a review of the entire record, and the court is of the opinion that the basis invoked to arrive at the amount of the judgment to be awarded the plaintiffs is not inequitable but one justified by the record. It must not be overlooked that the act of May 1, 1888 (25 Stat. 113), while not in form a treaty, was one in legal effect. The plaintiffs by assenting to the terms of *140 the act approved the division of the proceeds, recognized the rights of the foreign Indians involved, and voluntarily for a good consideration granted the rights which accrued to all.
The defendant’s motion for amendment of the findings and correction of the judgment is predicated upon what the court in its opinion said as to the allowance of items embraced within the defendant’s counterclaim. The court allowed the counterclaim as presented, holding that under the special jurisdictional act this language, “ all set-offs or counterclaims, including gratuities ”, clearly disclosed a congressional intent to charge the Indians “ with all sums disbursed for their benefit over and above those provided for in treaty obligations.” The court is still of that opinion.
The defendant, both before and on the date when the case was heard, did not include in its counterclaim the sum of $259,100.46 which had been expended for the education of tribal Indian children at nonagency schools, viz: Carlisle Indian School, $33,829.99; Genoa Indian School, $12,602.10; Haskell Institute, $34,210.14; Pierre Indian School, $11,-926.36, and Salem Indian School, $106,531.27. The omission to plead these items as a set-off is ascribed to the decision of the court in the Osage case, 66 C. Cls. 64, and the Fort Bert-hold case, 71 C. Cls. 308.
The court’s opinion points out the distinction between the special jurisidictional act in this and the Fort Berthold case. We will not repeat it. In addition to what was stated, it is apparent that so far as this precise issue is involved, what was said with reference thereto in the Osage case was oliter. The Osage case did not turn upon this question, and the observation of the court with respect to including the expense of educating Indian children at nonagency schools as a set-off was not a definite determination of that issue. There was no occasion to decide it.
The plaintiffs contest the allowance of any sums expended by the Government as claimed by the defendant. A comparison of the special acts in the Osage and Fort Berthold cases and this case is set forth in the brief, and from the same a construction of the language used in the acts is said to con *141 firm a conclusion that to all intents and purposes it means the same.
A gratuity, “ a free gift; a recompense ”, is designed to be beneficial. In a special jurisdictional act covering correlative rights and liabilities of the parties involved, it by no means follows that sums expended “ for the benefit of said tribe or band thereof ” include gratuities. When Congress in the special act now before us used the words “ also any legal defenses, set-offs, or counterclaims, including gratuities, which the United States may have against the said nation or tribes ”, the intention to include gifts we think is evident.
The court, as we view it, is obliged under the special act to credit the Government with not only all items of expenditure legally and equitably chargeable against the Indians, but with additional items in themselves gratuities which do not fall within the other category. From a legal and equitable point of view set-offs and counterclaims possess a significance quite distinct from gratuities.
It is next urged that nonagency schools inured exclusively to the benefit of individual Indians and not to the tribe or band. In a narrow sense this is true. In its larger aspect it is not. Irrespective of this contention, there exists no legal impediment which precludes Congress from charging against an Indian tribe sums which afforded members of the tribe an opportunity to procure a higher education at Government expense. The opportunity was afforded children of the tribes eligible to accept it.
In addition to the agency schools, the United States offered educational facilities to the Indians at its expense, and because all the Indian children could not avail themselves of the privilege it in no way detracts from the clear intent of Congress to grant to the Indian tribes something theretofore denied them.
Cases are cited establishing the rule that Congress does not legislate for the institution of suits by individual tribal Indians. We grant the fact, but that is not this case.
We think the defendant’s motion should be allowed. The former findings will be withdrawn and amended findings filed, the former judgment of the court set aside, and a new *142 judgment for $622,465.57 this day awarded the plaintiffs, in accord with the court’s opinion this day filed. It is so ordered.
Whaley, Judge; Williams, Judge; LittletoN, Judge; and GeeeN, Judge, concur.